IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| CHERI DAHLIN, Individually and on Behalf of the Estate of Dean Dahlin, Deceased,<br><br>    Plaintiff,<br><br>    v.<br><br>ARCHER-DANIELS-MIDLAND COMPANY; LYONDELL CHEMICAL COMPANY; EQUISTAR CHEMICALS, LP; and EQUISTAR GP, LLC;<br><br>    Defendants.<br>_____<br>ARCHER-DANIELS-MIDLAND COMPANY,<br><br>    Cross-Claimant,<br><br>    v.<br><br>LYONDELL CHEMICAL COMPANY; EQUISTAR CHEMICALS, LP; and EQUISTAR GP, LLC;<br><br>    Cross-Defendants. | Case No. 3:14-cv-00085-SMR-HCA<br><br>ORDER GRANTING ARCHER-DANIELS-MIDLAND COMPANY'S MOTION FOR SUMMARY JUDGMENT |

Before the Court are two motions. First is Defendant Archer-Daniels-Midland Company's ("ADM") Motion for Summary Judgment. [ECF No. 192]. Plaintiff Cheri Dahlin responded, [ECF No. 211], and ADM replied, [ECF No. 216]. Second is a motion by ADM to strike portions of Plaintiff's summary judgment response. [ECF No. 218]. Plaintiff responded to ADM's motion to strike. [ECF No. 222]. Oral argument was held January 28, 2016. [ECF No. 266]. The matter is fully submitted. For the reasons set forth below, the Court grants ADM's Motion for Summary Judgment and denies ADM's Motion to Strike as moot.

## I. FACTS

### A. *Dean Dahlin's Work Experience*

Plaintiff Cheri Dahlin alleges in her Third Amended Complaint that her husband, Dean Dahlin, developed acute myeloid leukemia and died as a result of occupational benzene exposure. [ECF No. 153]. Dean worked as a commercial truck driver for Dahlen Transport, Inc., ("Dahlen") from approximately 1990 to 1992, and for A&R Logistics, Inc. ("A&R") from approximately 1992 to 1995. *Id.* ¶ 14.

Dean's occupational duties included loading, transporting, and unloading Debutanized Aromatic Concentrate (DAC), which contains the carcinogen benzene. Dean hauled DAC from a petrochemical facility ("the Complex") in Clinton, Iowa, to a municipal dock storage facility ("the Dock") in South Clinton, Iowa. Plaintiff alleges the Complex was owned and/or operated by Defendants Lyondell Chemical Company; Equistar Chemicals, LP; and Equistar GP, LLC[1] (collectively "the DAC Company") and the Dock was owned and/or operated by ADM. *Id.* ¶¶ 14, 16.

Robert Tubbs worked with Dean at Dahlen and continued to work for Dahlen after Dean joined A&R in 1992—Tubbs left Dahlen in 1997. According to Tubbs, Dahlen was the exclusive hauler for the DAC Company until 1998. [ECF No. 192-3 at 73]. Tubbs testified in his deposition that A&R did not begin hauling DAC until 1998 when Dahlen ceased doing so.[2] *Id.* at 72; *see also*

---

[1] During the time of Dean's employment, the Complex was operated by ACC Chemical Company, The DAC Company Chemical Corporation, and Getty Chemical Company through their joint venture Chemplex Company, Inc. [ECF No. 153 ¶ 15]. Defendants Lyondell Chemical Company; Equistar Chemicals, LP; and Equistar GP, LLC are the successors in interest to those owners. [ECF No. 153 ¶ 16]. These successors in interest are collectively referred to as the DAC Company throughout this order.

[2] Plaintiff Cheri Dahlin does not know if Dean continued to haul DAC when he was employed by A&R Logistics, Inc. [ECF No. 192-3 at 91–92, 94].

ECF No. 211-5 at 6 (the DAC Company "went to one hauler" when A&R took over)]. But Tubbs estimated that he hauled DAC with Dean for five years, which suggests Dean continued to haul DAC when he went to work for A&R in 1992. [ECF No. 192-3 at 65–67]. Tubbs believed Dean had continued to work for Dahlen until 1997, and had then gone to A&R. *Id.* at 73. Ronald Reiser and John Lueders, who worked for the DAC Company, both recalled that A&R took over the DAC hauling contract in the early 1990s. [ECF Nos. 211-3 at 5; 211-5 at 6].

In her deposition, Plaintiff recounted taking clean socks to Dean at the Dock because the mats at the Dock were saturated with a stinky, chemical-smelling substance, which Plaintiff understood to be benzene. [ECF No. 192-3 at 82, 84]. She also testified that the floor mats in Dean's truck would be saturated with that same substance. *Id.* at 82–83. Dean would have to leave his shoes and socks outside his home or in the basement because they smelled. [ECF No. 211-8 at 4]. On one occasion, Plaintiff picked Dean up at the Dock and took him to the hospital because he had to have his eyes flushed. [ECF No. 192-3 at 85, 89].

Dean told Plaintiff the pipes at the Dock would often leak because the couplings did not fit tightly. *Id.* at 87. The leaks occurred when Dean would connect to a hose to unload DAC from his truck. *Id.* at 89. Dean would report leaks to his superiors at Dahlen so they could be fixed. *Id.* at 88. A man who worked at the Dock, Dale Jones, testified at his deposition that he could occasionally smell DAC at the Dock. [ECF No. 211-4 at 3–4]. Tubbs agreed that the couplings at the Dock sometimes leaked a few drops when the drivers would unhook the hose, and there was a bucket to catch these drops. [ECF No. 216-2 at 26]. Tubbs also remembered that, when it rained, DAC residue would float in a drainage pit area at the Dock. [ECF No. 211-6 at 4]. According to Tubbs, there were "times stuff has happened down there that there was DAC on the ground and then it went into the drain." [ECF No. 216-2 at 27].

## B. *ADM's Responsibility for the Dock*

ADM entered into an agreement ("Lease") with the City of Clinton for a twenty-year lease of the Dock beginning January 1, 1993. [ECF No. 63-1 ¶ 2].[3] ADM was to operate the Dock "as a public facility and to provide and furnish to all river carriers . . . services for loading, unloading or transferring of materials and commodities." *Id.* at 2. The lease further stated:

> [The DAC Company] currently utilizes the municipal dock for the shipment of DAC. A large tank and unloading facilities currently exist at the dock for these purposes. [The DAC Company] has an agreement with the current dock operator for the transferring of said material, which agreement will expire December 31, 1992. It will be necessary for ADM to enter into an agreement with Quantum to continue providing said services, provided reasonable terms can be negotiated to compensate and protect ADM.

*Id.* at 3.

In accordance with the Lease, ADM entered into a "Storage and Product Handling Agreement" ("Agreement") with the DAC Company.[4] [ECF No. 63-2]. This Agreement became effective January 1, 1993, and the initial term ended December 31, 1996. *Id.* at 1–2. Under the Agreement, ADM agreed to operate a 630,000 gallon tank, which belonged to the City of Clinton, exclusively for Quantum's storage of DAC. *Id.* at 2.

---

[3] Prior to January 1, 1993, ADM's only involvement with the Dock was providing commodities for loading onto barges for shipment. [ECF No. 192-3 at 51]. CF Sales, Inc. managed the Dock before ADM.

[4] The ownership of the Complex has transitioned multiple times. In September 1993, Quantum Chemical Corporation was acquired by Hanson, PLC, and the name was changed to Quantum Chemical Company. In 1996, the name changed back to Quantum Chemical Corporation and then, in March 1997, the name changed to Millennium Petrochemicals Inc. In October 1997, Lyondell Chemical Company formed a joint venture with Millennium Petrochemicals Inc., called Equistar Chemicals, LP. Equistar Chemicals, LP took ownership of the Complex. In 1998, Occidental Chemical Corporation became a third partner in Equistar Chemicals, LP. Lyondell Chemical Company bought out Occidental Chemical Corporation in 2002. In 2004, Lyondell Chemical Company acquired Millennium Petrochemicals Inc. and Equistar Chemicals, LP became a wholly-owned subsidiary of Lyondell Chemical Company. Equistar Chemicals, LP and Equistar GP, LLC are subsidiaries of Lyondell Chemical Company.

The DAC Company received 24-hour access to the tank "to facilitate transfer by tank truck of DAC from [the DAC Company's] manufacturing plant to the Tank and perform required maintenance." *Id.* at 3. The DAC Company was responsible for unloading its product into the tank. *Id.* The DAC Company also supplied all rail cars, barges, and trucks for handling DAC. *Id.* at 5. The DAC Company was tasked with clearly identifying any hazards associated by DAC and detailing any necessary precautions. *Id.* The Agreement specified that title to the DAC remained with the DAC Company at all times and that ADM was an independent contractor and not an agent or employee of the DAC Company. *Id.* at 7, 11.

As relevant, ADM was responsible for 1) providing the means to transfer DAC from the tank into barges, rail cars, or trucks for shipment; 2) supplying 24-hour security at the Dock; 3) hiring staff to "assure compliance with all applicable loading requirements and regulations"; 4) conducting visual inspections of the tank and loading equipment; 5) inventorying the tank; 6) loading barges; and 7) "provid[ing] handling equipment and supplies such as gloves, wrenches, landing lines, and goggles" for barge loading. *Id.* at 3–5, 7–8. ADM further agreed to "keep its equipment (including the unloading area) and storage facilities clean" to ensure the DAC did not become contaminated. *Id.* at 6. The DAC Company paid a monthly fee for these services, along with a per-gallon charge for DAC loaded on barges for shipment. *Id.* at 4.

ADM and the DAC Company did not renew the Agreement at the conclusion of its term in December 1996. Instead, the DAC Company contracted directly with the City of Clinton to use the Dock from March 1, 1997, through December 31, 2012. [ECF No. 189-4 at 51]. ADM was not a party to this contract. *Id.* at 64. ADM had no further involvement with DAC shipping at the Dock after its Agreement with the DAC Company expired.

## II. SUMMARY JUDGMENT STANDARDS

Familiar standards govern summary judgment motions. "Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014); Fed. R. Civ. P. 56(a). "'A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case.'" *Doe v. Hagar*, 765 F.3d 855, 860 (8th Cir. 2014) (quoting *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011)). The moving party bears the burden of demonstrating there are no genuine issues of material fact. *Gibson v. Geithner*, 776 F.3d 536, 539 (8th Cir. 2015). Courts must view "'the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be drawn from the record.'" *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)).

State substantive law controls state law claims before federal courts sitting in diversity. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *In re Baycol Prods. Litig.*, 616 F.3d 778, 785 (8th Cir. 2010). Iowa law thus governs the substantive matters in this case.

## III. ANALYSIS

Plaintiff has filed suit alleging theories of negligence (Count I), product liability (Count II), wrongful death (Count III), loss of consortium (Count IV), and punitive damages/malicious acts (Count V). [ECF No. 153]. Plaintiff levels these claims against all of the named Defendants. [ECF No. 153]. Plaintiff presents four theories underlying the negligence count: (1) premises liability, (2) manufacturing defect, (3) design defect, and (4) failure to warn. Plaintiff's product liability claim in Count II then asserts strict liability claims based on manufacturing defect, design

defect, and failure to warn. *See Lovick v. Wil-Rich*, 588 N.W.2d 688, 698 (Iowa 1999) (explaining product liability law encompasses both negligence and strict liability theories).

Counts III through V all turn on the viability of Counts I or II. Wrongful death in Iowa is a derivative statutory claim, *see Handeland v. Brown*, 216 N.W.2d 574, 576 (Iowa 1974), and "[p]unitive damages are merely incidental to the main cause of action," *Campbell v. Van Roekel*, 347 N.W.2d 406, 410 (Iowa 1984). Similarly, an Iowa loss of consortium claim cannot lie against a defendant who is not liable to the plaintiff as a matter of law. *Bergfeld v. Unimin Corp.*, 226 F. Supp. 2d 970, 983 (N.D. Iowa 2002), *aff'd*, 319 F.3d 350 (8th Cir. 2003). Accordingly, Plaintiff must be able to survive summary judgment on at least one theory under Count I or II in order to proceed on Counts III through V.

ADM attacks all of Plaintiff's theories in its Motion for Summary Judgment. [ECF No. 192]. The only theory Plaintiff defends in her response is her premises liability theory of negligence. Plaintiff explicitly concedes, "ADM's involvement in this case does not support a claim for strict liability[.]" [ECF No. 211 at 7]. The Court therefore considers only Plaintiff's premises liability theory of negligence and deems her remaining theories abandoned. *See Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

ADM argues Plaintiff cannot prevail on her premises liability theory of negligence because she cannot prove the "duty" prong—ADM asserts it owed no duty to Dean because it had no responsibility for the DAC unloading or storage. In response, Plaintiff cites the Restatement (Second) of Torts § 328E and the Restatement (Third) of Torts § 7 and contends ADM owed a duty to Dean as the possessor of the Dock and the tank. [ECF No. 211 at 5]. In her response to ADM's Motion for Summary Judgment, Plaintiff summarizes how ADM was negligent:

1. Failing to keep its premises in a reasonably safe condition;

2. failing to protect invitees, such as Dean Dahlin, from hazards associated with exposure to DAC; and

   3. failing to provide a safe place to work.

*Id.* at 2–3. Plaintiff emphasizes that ADM retained control over the Dock where the benzene was loaded and shipped and that ADM derived a monetary benefit from contracting with the DAC Company. *Id.* at 6–7.

The Iowa Supreme Court has previously employed § 343 of the Restatement (Second) of Torts (1965) in deciding whether a possessor of land is subject to liability for harm to an invitee. *Wiedmeyer v. Equitable Life Assur. Soc'y of U.S.*, 644 N.W.2d 31, 33 (Iowa 2002). But the Iowa Supreme Court has increasingly employed the Restatement (Third) of Torts: Liability for Physical and Emotional Harm (2012) ("Restatement (Third)") and the Court thus relies upon the Restatement (Third) in evaluating Plaintiff's claim. *See, e.g.*, *Crow v. Simpson*, 871 N.W.2d 98, 106 (Iowa 2015) (citing § 29 of the Restatement (Third)); *Hagenow v. Schmidt*, 842 N.W.2d 661, 664 (Iowa 2014) (considering §§ 9, 11, and 15 of the Restatement (Third) and commenting § 11(b) "best fits the facts of this case"); *Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 776 (Iowa 2013) (relying on § 40 of the Restatement (Third)); *State v. Tribble*, 790 N.W.2d 121, 127 (Iowa 2010) (applying § 26 and § 27 of the Restatement (Third)); *Thompson v. Kaczinski*, 774 N.W.2d 829, 835 (Iowa 2009) (adopting § 7 of the Restatement (Third)).

Two provisions of the Restatement (Third) apply to the facts here. First, § 51 provides that "a land possessor owes a duty of reasonable care to entrants on the land with regard to":

   (a) conduct by the land possessor that creates risks to entrants on the land;

   (b) artificial conditions on the land that pose risks to entrants on the land; [and]

   (c) natural conditions on the land that pose risks to entrants on the land[.]

Restatement (Third) § 51. "The status of a 'possessor of land' turns on occupation and control of the land, not mere ownership." *Wiedmeyer*, 644 N.W.2d at 33.

Second, § 53 of the Restatement (Third) imposes a duty on lessors to entrants on the leased premises. Under § 53, a lessor bears "a duty of reasonable care under § 51 for those portions of the leased premises over which the lessor retains control" and "a duty of reasonable care for any dangerous condition on the leased premises at the time the lessee takes possession if . . . the lessor has reason to believe that the lessee will admit persons onto the leased premises without rectifying the dangerous condition." Restatement (Third) § 53(a), (d)(2); *see also Sauve v. Winfree*, 985 P.2d 997, 1002 (Alaska 1999) (following the "general trend in the case law" allowing suits against a commercial landlord brought by injured employees of a commercial tenant).

The Court must consider these Restatement (Third) provisions in tandem with the Iowa Supreme Court's case law on duty. In *Thompson*, the Iowa Supreme Court adopted § 7 of the Restatement (Third), which provides, "'An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.'" 774 N.W.2d at 835 (citing Restatement (Third) of Torts § 7(a), at 90). Pursuant to § 7, "[t]he general duty of reasonable care will apply in most cases, and thus courts . . . need not refer to duty on a case-by-case basis." *Id.* at 834–35 (internal quotation marks omitted) (citing Restatement (Third) § 7 cmt. *a*, at 90). Only in exceptional cases is the general duty to exercise reasonable care displaced or modified. *Id.* at 835. "An exceptional case is one in which 'an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases.'" *Id.* (quoting Restatement (Third) § 7(b), at 90); *see also McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 371 (Iowa 2012) ("[A] lack of duty may be found if either the relationship between the parties or public considerations warrants such a conclusion."). But the Iowa Supreme Court has explained that its pre-*Thompson* case law on duty was "not erase[d]" by the adoption of § 7 of the Restatement (Third); Iowa law was modified only to the extent foreseeability now cannot enter into the duty calculus. *See McCormick*, 819 N.W.2d at 371 ("[O]ur previous law of duty [is] otherwise still alive and well.").

ADM relies on two Iowa Supreme Court cases in arguing it had no duty to Dean, one pre-*Thompson* and one post-*Thompson*. In the 2012 decision of *McCormick*, the Iowa Supreme Court held that a party who had "transferred control and never had ownership" of a premises had no duty to one later injured on the premises. 819 N.W.2d at 373 (emphasis omitted). The Court rested its holding on the "common principle" that "liability is premised upon control." *Id.* at 372 (internal quotation marks and emphasis omitted). Likewise, the Iowa Supreme Court recognized in the 1999 decision of *Van Essen* that "retained control is an exception to the rule of nonliability," but "that one who has transferred ownership and control is no longer held liable." *Van Essen v. McCormick Enters. Co.*, 599 N.W.2d 716, 720–21 (Iowa 1999) (internal quotation marks omitted).

In sum, both the governing sections of the Restatement (Third) and Iowa case law make clear that control is a prerequisite to imposing liability on a land possessor/lessor. It is therefore outcome-determinative that Plaintiff admitted the following statements from ADM's statement of material facts:

1. "From January 1, 1993 and continuing through at least 1996, the delivery, unloading, storage and transfer to barge for shipment, of [the DAC Company's] DAC product was always under the exclusive control of [the DAC Company] and the entity(ies) hired by [the DAC Company] to haul, deliver, unload and transfer [the DAC Company's] DAC product at the Clinton Municipal Docks." [ECF Nos. 192-2 ¶ 36; 211-1 ¶ 36].

2. "ADM never had any control, and did not have any right to control, the delivery, unloading, storage or transfer of [the DAC Company's] DAC product at the Clinton Municipal Docks." [ECF Nos. 192-2 ¶ 37; 211-1 ¶ 37].

3. "From January 1, 1993 and continuing through at least 1996, the locations at the Clinton Municipal Docks used for the delivery, unloading, storage, transfer and barge loading of [the DAC Company's] DAC product were always under the exclusive control of [the DAC Company] and the entities hired by [the DAC Company] to haul, deliver, unload and load [the DAC Company's] DAC product at the Clinton Municipal Docks." [ECF Nos. 192-2 ¶¶ 38; 211-1 ¶ 38].

4. "ADM never had any control, and did not have any right to control, the locations at the Clinton Municipal Docks used for the delivery, unloading, storage, transfer or barge loading of [the DAC Company's] DAC product at the Clinton Municipal Docks." [ECF Nos. 192-2 ¶¶ 39; 211-1 ¶ 39].

Through these admissions, Plaintiff has conceded ADM had no control over the instrumentalities that allegedly caused Dean's death.

These admissions are binding. *Cf. Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990) ("As a rule, admissions in the pleadings are in the nature of judicial admissions binding upon the parties, unless withdrawn or amended." (alterations and internal quotation marks omitted)). Although Plaintiff's brief cites to facts that suggest ADM did have some measure of control, such citation cannot overcome Plaintiff's express admissions. *Cf. Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 333 (7th Cir. 1993) ("An admission trumps evidence, rather than vice versa."); *Americans United For Separation of Church & State v. Prison Fellowship Ministries*, 395 F. Supp. 2d 805, 809 (S.D. Iowa 2005) ("Admissions made by a party, by formal means, in an adversarial process closely (in this case, meticulously) scrutinized by experienced attorneys, should not be lightly discarded . . . ."). Accordingly, summary judgment must be granted to ADM on Plaintiff's premises liability negligence claim (and her wrongful death, loss of consortium, and punitive damages claims) because no genuine issue of material fact exists. With no control, ADM had no duty. And because the Court concludes summary judgment must be granted on this basis, the Court does not reach ADM's alternative argument regarding the dates Dean worked at the Dock.

IV. CONCLUSION

Defendant Archer-Daniels-Midland Company's Motion for Summary Judgment, [ECF No. 192], is GRANTED. Plaintiff's Third Amended Complaint, [ECF No. 153], is DISMISSED with prejudice to the extent that it states claims against Defendant Archer-Daniels-Midland

Company.  Defendant Archer-Daniels-Midland Company's Motion to Strike Portions of Plaintiff's Response, [ECF No. 218], is DENIED as moot.

    IT IS SO ORDERED.

    Dated this 4th day of February, 2016.

_____
STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT